MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY
v.
ELLIS W. HAYES AND DANIEL D. HAYES.

*Life Insurance—Use of Intoxicating Liquors—Surrender of Policy—
Action to Recover Balance—Charge of Fraud, not Sustained by the Evidence—Representations of Agent—Finding of Facts by the Court.*

1. In an action to recover a balance claimed to be due on a policy of life insurance, the surrender of which is alleged to have been fraudulently procured by the agent of the defendant, it is held, upon a review of the evidence, that the charge of fraud is not sustained and is not true in fact.

2. Where the parties to a settlement sustain to each other no relation of trust or confidence, the settlement can not be impeached as fraudulent because of a false affirmation by one of them of mere matter of opinion, or even of fact, which is at least equally open to the knowledge or inquiry of the other.

[Opinion filed August 26, 1886.]

APPEAL from the Circuit Court of Coles County; the Hon· C. B. SMITH, Judge, presiding.

Messrs. JAMES A. CONNOLLY and F. K. DUNN, for appellant.

A party who seeks to relieve himself from the obligation of his contract on the ground of fraudulent misrepresentation, must establish by clear proof that there has been a knowing misrepresentation of a matter material to his interests, which has misled him to his hurt. A false affirmation of mere matter of opinion, or even of fact equally open to the knowledge or inquiry of both parties, in regard to which neither could be presumed to trust the other, is not available for such purpose. 1 Story, Eq. Jur., Secs. 191, 197–201.

" The misrepresentation must not only be in something material, but it must be in something in regard to · which the one party places a known trust and confidence in the other. It must not be a mere matter of opinion equally open to both parties for examination and inquiry, where neither party is presumed to trust to the other, but to rely on his own judg-

ment. Matters of opinion between parties dealing upon equal terms, though falsely stated, are not relieved against." Tuck v. Downing, 76 Ill. 71; Fulton v. Hood, 34 Pa. St. 365, 371; Foley v. Cowgill, 5 Blackf. 18.

A wilful misrepresentation as to the price paid for land, or its value, or the probability of a sale, does not make a case of fraud, so as to enable the party deceived to recover back the excess of price paid by him under the influence of such statement. Banta v. Palmer, 47 Ill. 99; Merryman v. David, 31 Ill. 404; Fish v. Cleland, 33 Ill. 238; Cleland v. Fish, 43 Ill. 282.

" Yet, though the misrepresentation be even wilfully false, in order to found a right in the party to whom it is made, to avoid it, it should be of such a nature that he had a clear right to rely upon it as an actual and undisputed fact. \* \* \* Every misrepresentation of a material fact is fraudulent in law if the party to whom it was made did not have equal means of knowing or ascertaining its falsity, or if it be made in such a manner as to induce him to forbear making any inquiries in regard to it." Story on Contracts, Sec. 510.

"A man who knows or has the means of knowing his rights, must, under ordinary circumstances, be expected to stand upon them. Mayhew v. Phœnix Ins. Co., 23 Mich. 105; Ætna Ins. Co. v. Reed, 33 Ohio St. 283.

"In an action for deceit no recovery can be had unless the plaintiff himself exercised ordinary prudence to guard against the deception and fraud practiced upon him, unless he has been thrown off his guard by the other party." Schwabacker v. Riddle, 99 Ill. 343.

The representations made by Pendergast, in the interview with Hughes, were not such as the latter was in law author, ized to rely upon as actual and undisputed facts, and thereupon forego all inquiry upon the subject. They were not really representations of facts at all, but only of Pendergast's investigation and its results.

Mr. Hughes had at least equal means with Pendergast of ascertaining the truth or falsity of the latter's information. No attempt was made to induce him to forbear making in-

quiry in regard to it. He was not "thrown off his guard by the other party." In fact, it was not until after the interview was over, and the hopes of a settlement abandoned by both parties, and after consultation with his friends in Mattoon, that he came to Pendergast with a wholly new proposition of his own, which was accepted. Even then he was unwilling to proceed until he had consulted Mrs. Hayes, the plaintiff in this suit, the mother of his wards, whose interests were involved, in whose family Job Hayes had lived for many years. Their means of knowledge in regard to Job Hayes' habits were far greater than Pendergast's. Hughes lived in Mattoon, where Job Hayes had lived for several years. He knew Hayes' family, friends and associates in Mattoon, and knew that many of his relatives and associates remained at Lawrenceburg, from whom all the information he might desire as to his habits could be obtained.

Pendergast's representations, at most, amount to no more than the expression of an opinion. "Matters of opinion between parties dealing upon equal terms, though falsely stated, are not relieved against." Story, Eq. Jur., Sec. 197; Tuck v. Downing, 76 Ill. 71; Fulton v. Hood, 34 Pa. St. 365; Foley v. Cowgill, 5 Blackf. 18.

"To render a representation fraudulent, it must be false, and not only so, but the party making it must know that it is false. To recover in an action for deceit, the statement must be untrue; the party making it must know it is false, and the party seeking to recover must have relied upon the state-ment as true, and have been induced to act upon the statement; and the statement, to authorize a recovery, must have been in relation to a matter material to the transaction." Merwin v. Arbuckle, 81 Ill. 501; Tone v. Wilson, 81 Ill. 529; St. L. & S. E. R. R. Co. v. Rice, 85 Ill. 406; Wheeler v. Randall, 48 Ill. 182; Richards v. Betzer, 53 Ill. 466.

"A knowledge of the falsity of the representations must rest with the party making it, and he must use some means to deceive or circumvent. St. L. & S. E. R. R. Co. v. Rice, 85 Ill. 406; Walker v. Hough, 59 Ill. 375; Sims v. Klein, Breese, 233; Dunbar v. Bonesteel, 3 Scam. 32; Fountleroy v. Wilcox, 80 Ill. 477.

Messrs. CRAIG & CRAIG, for appellees.

A compromise procured through the artfulness of another party will not be upheld. Knotts v. Preble, 50 Ill. 226; Headley v. Hackley, 50 Mich. 43.

Fraud may be proved by circumstances. Bullock v. Marrott, 49 Ill. 62; Bowden v. Bowden, 75 Ill. 143.

" It is the duty of every party, in making a contract, to be honest and truthful in his statements and representations, and although a party to a contract is bound to exercise reasonable care and caution to prevent being defrauded, yet if the party committing the fraud make use of such false statements, representations and acts, with respect to a material inducement to the contract, as are calculated to deceive and mislead a person acting with common prudence and without indiscretion, and he is thereby induced to enter into a contract, or to part with his property, then such party can not be heard to complain that the person so deceived and misled did not make such inquiries as might have resulted in a discovery of the falsity of the representations." Eames v. Morgan, 37 Ill. 263.

"If a party makes a representation, not knowing whether it was true or false, he can not be considered innocent, since a positive assertion of fact is by plain implication an assertion of knowledge concerning it. Hence, if the party has no knowledge about it he has asserted for truth what he knows to be false." Bigelow on Fraud, 61 1st Met. 193, 201; Bennett v. Judson, 21 N. Y. 238 ; Stone v. Covell, 29 Mich. 363.

" It is not essential, however, that the representation should form the sole inducement to a contract; it is enough that they form a material inducement. " Cooley on Torts, 502.

CONGER J.    This case, after passing through various amendments and having been once in this court (16 Ill. App. 233), was finally tried upon a declaration wherein appellees, by their next friend, allege that appellant, on the 16th day of February, 1874, insured the life of one Job Hayes for their benefit, in the sum of $12,000 ; that Job Hayes died August 19, 1876; that James F. Hughes was the guardian of appellees, and as such had

charge and control of the policy; that appellant, through its agents and servants, in order to cheat and defraud appellees, and to obtain fraudulent settlement and the possession of said policy, on April 20, 1877, falsely, fraudulently and covinously and with intent to cheat and defraud appellees, represented to Hughes, the guardian, that said Job Hayes had been, before the policy was issued, a person who used intoxicating liquors daily and habitually; that said statements were false, and defendant when making them knew them to be false; that the guardian relied upon such statements, and said defendant obtained by said fraud from said guardian the agreement to accept $6,045, in settlement of said policy and its surrender to appellant.

Pleas were filed, trial had, and a verdict for $9,060 rendered in favor of appellees, and judgment being entered thereon appellant brings the record to this court.

The foundation of this action being the alleged fraudulent and false statements of one Pendergast, who was the agent of appellant in making the settlement with Hughes, the guardian, and Pendergast and Hughes being the only witnesses upon this point, it will only be necessary to notice their testimony.

Hughes says that the first thing he did toward collecting the policy was to send to the company an overdue premium. He then forwarded the proofs of death, and in March, 1877, Pendergast, the agent of appellant, visited Mr. Hughes in reference to the matter, but nothing was done, and Pendergast left without making any propositions of settlement. On the 16th of March suit was instituted upon the policy, but the summons remained in the possession of Hughes until Pendergast returned. April 20th Pendergast returned, and their interview and settlement is fully shown by Mr. Hughes' testimony, which we quote in full from the abstract.

"Mr. Pendergast came there on April the 20th, something over a month after this summons was issued. He came to see further about the business, and reported to me that during his absence he had been down to Lawrenceburg, Indiana, where Job Hayes had formerly lived, investigating the correctness of his answers on his application, and told me that he

Mass. Mutual Life Ins. Co. v. Hayes.

had there found that his answers to two of those questions, regarding the use of intoxicating liquors, were false, and that he had found the proof there to show that they were false, and we discussed that. He also said that he was desirous of settling the matter, and was willing to pay an amount equal to what it would cost to defend a suit on the policy. I asked him what amount that was, and he mentioned the sum of probably $2,500 to $3,000, and that he would just as soon pay it as pay it out in expenses in defending a suit; that he would not feel like paying any more than that. I told him I could not accept that, and he intimated then that he had some other defense to it. I asked him what it was. I asked him if it was something about his grandmother, and he laughingly replied that it was. That part was passed between us in a jocular manner, neither of us attaching any importance to it—at least I did not, and after a general friendly conversation between us about the matter, we went out of the office. This took place in my office. I don't remember of going out together, but perhaps we did; we both went out anyway. I opened the drawer, and took out the summons which I had in reserve for him, but not while Pendergast was in there. If I went out with him I afterward went back and got it. Mr. Pendergast did not know I had the summons. I did not let him know it. I wanted to settle with him, and if I did settle that was the end, and if he did not settle I did not want him to leave town until I got service on him. He went away. I was not disposed to accept the offer, and he was not disposed to offer more, and I got my summons and hunted up a deputy sheriff and handed it to him, and while I can not recollect pointing out Mr. Pendergast, the probability is I did. Mr. House served the summons on him. After he had been served I went into the barber shop where he was. I don't remember how I knew he was there, or whether I saw him go in; I only know I went in there and saw him sitting in a chair. There was no conversation that I recollect of between myself and Mr. Pendergast or anybody else representing this company, between the time he left my office and the time of serving the summons on him, nor between the

time he left my office and the time I met him in the barber shop. I went in and asked him if he had received the summons and he said he had. I told him I had been thinking about the matter since we had our talk in the office, and that I had made up my mind to make him an offer or proposition— he had made me one I had not accepted, and I thought I would make him one, and I proposed if he would pay fifty cents on the dollar on the amount due on the policy, that I would take it, provided the mother, Mrs. Hayes, would consent to it. I can not say I have a memory of having told him of having consulted other parties. I did consult with two or three other men in whom I had confidence as to whether or not I had better make such a proposition as that, and detailing to them what information I had derived from Mr. Pendergast about the case, and after consulting with them I concluded to go and make the offer. I have no memory as to whether I told Mr. Pendergast I had so consulted them. If he remembers I did so I have no doubt it is true. I approached him and made this proposition while he was sitting in the barber's chair, and it was made dependent on my having an opportunity of consulting Mrs. Hayes. I told him she was in Shelby County at some distance—in the town of Shelbyville—and I could go to Shelbyville on the noon train ; go to see her and get back by 11 o'clock at night, in time to see him, and in case we settled it he could go on to Chicago at 12 or 12:30 o'clock, and that arrangement was made between us. He agreed to wait while I went to Shelbyville and saw her. I went out and got a team at Shelbyville, and drove out three or four miles in the country, and found Mrs. Hayes where she was visiting, and I had a talk with her about the matter. I told her of Mr. Pendergast being in Mattoon, and what proposition I had made to him, and that he had agreed to accept it in case I got her to accept of it, and I asked her what she thought I had better do about it, and her reply to me was to do as I thought best. I told her I thought it was best to make that settlement. I then came back to see Mr. Pendergast. He made out and gave me two drafts of equal amounts, $3,022.50 each, making $6,045, which was fifty per cent. of the amount then due, principal

and interest. I gave him up the policy, and signed this receipt he had already prepared. He had the drafts and receipt prepared, and I signed the receipt and gave him the policy. He was expecting to go north on the midnight train on the Illinois Central, and probably had only about an hour after I would get back, and had these papers prepared to save time. These drafts were paid. I got the money, made a report of it to the court, and paid it out under direction of the court for the use of these children. The suit which I commenced against the company, and had the summons served, I had dismissed at the next term of court. I think these papers shown me are all the files of that case. There was a precipe and summons, and then the suit dismissed without any further paper being filed; there was no declaration. I have no recollection when I made known to Mrs. Hayes that I had completed the arrangement or of her saying anything about it. I saw her frequently. She knew, of course, in some reasonable time, that I had completed the settlement, I don't know just when."

Mr. Pendergast's statement of the settlement is substantially the same, except he gives more in detail what he had learned at Lawrenceburg as to Job Hayes' habits in reference to the use of intoxicating liquors.

The other evidence tends to show that Pendergast was told by parties in Lawrenceburg certain things in reference to Hayes' habit that might lead one inquirer to the conclusion that Hayes had been in the habit of using intoxicating liquors to excess, and another to a different conclusion.

Altogether it may be conceded when all the evidence taken in this case is considered it is reasonably clear that such charge against Hayes was not true. But the question is not what were his habits as developed upon a full investigation, but did Pendergast have such information at the time he visited Lawrenceburg as would enable him to form an honest opinion that Hayes had been in the habit of using intoxicating liquor to excess. We think he did. Again, Pendergast's statements, even as given by Hughes, can not be regarded as statements of facts peculiarly within his own knowledge, and upon which Hughes could rely without making an investigation.

Hughes says Pendergast's statement was "that he had found that Hayes' answers to two of the questions regarding the use of intoxicating liquors were false, and that he had found the proof to show that they were false." What character and quality of proof would have sustained this charge was and must necessarily be a mere matter of opinion; rumors and loose declarations, not legal evidence at all, might lead a man unlearned in the law to suppose he had found proof of some disputed fact, while the same things presented to the mind of a lawyer would enable him to say at once that there was no value to them as evidence.

The parties were standing at arm's length. No relation of trust or confidence existed between them; Hughes had known for some time that the company was disputing the claim. The means of investigating the habits of Hayes at Lawrenceburg were equally open to both, and, in fact, more favorable to Hughes than the company, for the reason that Maggie Hayes, the mother of appellees, was a sister-in-law of the deceased and had relations at Lawrenceburg.

It was the duty of the guardian, if he thought the statements of Pendergast at all material as to the liability of the company, to investigate for himself, and not trust to the opinion of the agent of the company, "that proof had been found sufficient to show that Hayes had been in the habit of using intoxicating liquors to excess."

Perhaps there is no one subject investigated in courts of justice so difficult to define and establish by evidence as the charge that a man is in the habit of using intoxicating liquors to excess. The views of men upon the subject are so diverse, and are so moulded by education and prejudice, that no uniform standard of judgment upon the subject is possible.

Again, the proposition made to Hughes by Pendergast at the time of this statement was neglected and negotiations broken off. After the summons was served upon Pendergast, Hughes upon his own motion made another proposition, upon condition that the mother of appellees should approve it, which was accepted; the mother did approve, and it was completed.

We see nothing in the case to justify the charge in the declaration that the settlement was procured by fraud.

It is said Hughes had no authority to make the settlement. We express no opinion upon that question, as that can only arise when the policy itself is sought to be enforced. Whether he had the power to settle or not does not arise in this case.

We see no legal grounds for a recovery in this case, and the judgment of the Circuit Court will therefore be reversed.

*Reversed.*

Finding of facts by the court, to be incorporated in the final judgment by the clerk:

The court finds that the policy of insurance for $12,000, issued on the 16th day of February, 1874, upon the life of Job Hayes, for the benefit of Ellis W. Hayes and Daniel D. Hayes, was, on the 20th day of April, 1877, by James F. Hughes, guardian of said Ellis W. and Daniel D. Hayes, surrendered to the agent of the said insurance company for the consideration of $6,045, then paid to said guardian by the agent of said insurance company.

The court further find that the charge in the declaration that the surrender of said policy was procured by fraud upon the part of said insurance company, or its agent or agents, is not supported by the evidence and is not true in fact.